**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 08-cv-01584-CMA

JENNIFER STENDER, on behalf of
H.S., a minor child,

      Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

      Defendant.

---

### ORDER OF REMAND

---

Pursuant to 42 U.S.C. § 405(g), Plaintiff Jennifer Stender, on behalf of her minor son, H.S., appealed from the denial of supplemental security benefits ("SSI") by the Social Security Commissioner ("Commissioner"). After a hearing on Plaintiff's application, the Administrative Law Judge ("ALJ") found that H.S. was not "disabled" within the meaning of the Social Security Act ("Act") because H.S. did not have a severe impairment that medically or functionally equals an impairment in the listings.

### BACKGROUND

I. **MEDICAL HISTORY**

Plaintiff alleges that H.S., who was nine years-old when Plaintiff filed her application and twelve-years-old when the ALJ issued her decision, suffers from attention deficit hyperactivity disorder ("ADHD"), diabetes mellitus, and oppositional defiant disorder ("ODD"). She argues that H.S.'s impairments prevent him from

functioning at school, home, and in other social situations.  The record presented to this

Court contained numerous documents from H.S.'s teachers, medical and psychological

sources and other, miscellaneous information regarding H.S.'s condition and abilities.

    A.    <u>Teachers' Reports</u>

    Much of the information in the record concerning H.S.'s functioning and behavior

comes from his teachers.  For example, one of H.S.'s teachers, Betty Fields, noted that

H.S. "does well" when he can stay on task, but H.S. had problems with "talking out" and

"bothering others."  *(*Administrative Record ("Admin.") at 90.)  She stated that H.S. is

"unable to stay on task for any length of time, up and about in the classroom, [and]

always in motion."  Ms. Fields concluded that H.S. could not work independently as an

average child of H.S.'s age, but that medication resulted in fewer outbursts, better

concentration, and improved quality of work.  (*Id.*)  In January 2001, Ms. Fields wrote a

letter stating that, although she felt that H.S. "is a good kid at heart, he is constantly

disruptive in my classroom. * * * It is a constant battle with him."  (*Id.* at 133.)  She gave

him mostly Ds and Cs on his report card and noted that he needed improvement in

citizenship, homework completion, and academic effort.  (*Id.* at 135.)

    Likewise, H.S.'s fourth-grade teacher filled out a "Teacher Questionnaire."[1]

(*Id.* at 99.)  This teacher noted that H.S. "seems to be distracted with other things when

learning a new concept."  (*Id.* at 100.)  The teacher checked boxes indicating that H.S.

had problems acquiring and using information, attending and completing tasks,

---

[1]  The teacher signed the questionnaire, but the name is illegible.  (*Id.* at 106.)

interacting and relating with others, caring for himself (*e.g.*, he forgets to go to the nurse for his insulin shots), but the teacher could not describe any problems with H.S.'s medical conditions or physical well-being.  (*Id.* at 100-105.)  Once again, H.S.'s teacher noted that H.S. likes to "move about a lot."  (*Id.* at 103.)

His fifth-grade teacher, Mrs. Liffiton, wrote a letter stating that H.S.'s "attention wanders easily during written tasks," he had difficulty staying in his seat, and he liked to "interact with other children whenever possible."  (*Id.* at 138.)  The record contains numerous disciplinary notes to Plaintiff regarding H.S.'s behavior.  However, Ms. Liffiton did note that H.S.'s behavior had improved since the beginning of her year teaching H.S.  (*Id.* at 140.)  School records reflect that H.S.'s gym and music teachers also had disciplinary issues with H.S.  (*See id.* at 331-354.)

His most serious offense occurred in January 2005, H.S.'s school suspended him for two and one-half days for bringing a pocket knife to school.  (*Id.* at 450.)  During that same year (2004-2005, H.S.'s sixth-grade year), H.S.'s teacher, Ms. Arnold, noted that the lack of medication caused H.S. "to be unable to control his behavior."  (*Id.* at 456.)  Ms. Arnold also noted that H.S. was "very intelligent and caring," but that he was struggling with aggression towards others and had exhibited some anti-social behaviors.  (*Id.* at 457.)  She attributed much of his bad behavior to lack of medication.  (*Id.*)

H.S.'s records contain some reports of positive behavior.  For example, his kindergarten teacher stated that H.S. assumed responsibility well and had a great

attitude towards school.  (*Id.* at 152.)[2]  However, by first grade, H.S.'s teacher began to note that H.S. had trouble staying on task and that his behavior disrupted the class at times.  (*Id.* at 154.)  Regardless of his behavior, both kindergarten and first grade teachers noted that H.S. demonstrated average to above-average grasp of common school subjects like reading, writing, and math.  (*Id.*)

He also demonstrated average to above-average scores on various school achievement tests.  For example, he scored above-average on a third-grade math achievement test (*id.* at 159), and Stanford Achievement Test Series for second and third grades revealed that H.S. fell within average range for each subject tested.  (*Id.* at 161.)

B.      Doctors and Mental Health Professionals' Reports

Plaintiff alleges that H.S. suffers from ADHD, ODD, and diabetes.  She alleges that treatment of H.S.'s ADHD has been hampered by complications of the diabetes, *e.g.*, weight loss and anorexia, and financial issues, which hampered her ability to pay for treatment.

1.      *Mental Health*

H.S. saw multiple treaters at Pediatrix over the fall of 2001 and through the spring of 2002 for complaints of ear pain, a runny nose, one incident involving a pencil-stabbing and general pediatric health issues.  (*See id.* at 218-235.)  Many of these records are

---

[2]   The Court should point out that this note concerns H.S.'s behavior before Plaintiff filed her application, and before H.S. was diagnosed with ADHD or diabetes.

unremarkable or unrelated to the issues in this case.  However, in September 2001,

Dr. Subir Mitra, H.S.'s primary care pediatrician, diagnosed H.S. as having ADHD.

(*Id.* at 232.)  Dr. Mitra began treatment with Ritalin, but H.S. still had trouble with

"hyperactivity and impulsivity."  (*Id.* at 229.)  So, sometime prior to December 2001,

Dr. Mitra switched H.S. to Adderall, which worked much better at controlling H.S.'s

ADHD.  (*See, e.g., id.* at 227, 228.)[3]

H.S. saw Dr. Mary Nowlin for mental health treatment beginning in July 2002.

Dr. Nowlin confirmed ADHD and ODD, and also noted that he suffered from juvenile

diabetes mellitus.  (*Id.* at 200.)  Dr. Nowlin immediately increased the dosage of H.S.'s

Adderall "to help with the ADD sx."[4]  (*Id.*)  Over the next year, H.S. continued to see

Dr. Nowlin, who noted that H.S.'s mental illness ranged from "mildly ill" to "markedly ill."

(*Id.* at 362, 364, 365.)  Dr. Nowlin varied between describing H.S.'s condition as "much

improved" to "minimally worse" since she started treatment.  (*Id.* at 184, 185, 364.)

Medication logs indicate that Dr. Nowlin attempted to adjust H.S.'s medication by

trying different drugs (Adderall, Ritalin, Metadate, and Concerta) and different dosages.

(*See, e.g., id.* at 274.)  The Adderall seemed most effective at treating H.S.'s ADHD;

however, it allegedly caused H.S. to stop eating, which presented a serious problem for

management of H.S.'s diabetes, so it was discontinued.  (*Id.* at 364, 366.)  Likewise,

---

[3]   H.S.'s doctors continued to switch ADHD medications throughout the course of the next few years until Plaintiff could no longer afford the drugs, at which point H.S. stopped taking medication in 2004.

[4]   Presumably, "sx" stands for symptoms.

the Metadate helped with the ADHD, but did not help with H.S.'s ability to concentrate. (*Id.* at 364.)

Dr. Nowlin's records indicate that H.S. did not present a threat to himself or others and that he was "cooperative, talkative [and] redirectable." (*Id.* at 363.)  She initially gave H.S. a Global Assessment Functioning ("GAF") score of 65, which indicated that he had some mild symptoms, but generally functioned well and had some meaningful interpersonal relationships. (*Id.* at 372, 368.)  However, she raised his score slightly over the course of her treatment relationship, meaning his functioning had improved.  In the most recent record from Dr. Nowlin, dated June 10, 2003, she gave H.S. a GAF score of 75, indicating that H.S.'s symptoms were transient and expectable reactions to psychosocial stressors. (*Id.* at 362.)

In August 2003, H.S. transferred from Dr. Nowlin and began to see Dr. Letecia Jacinto for psychiatric evaluation. (*Id.* at 271.)  Dr. Jacinto noted that H.S. was "cooperative," his thought processes were "unremarkable," and that his judgment, insight, "fund of knowledge," and concentration were "fair." (*Id.* at 272.)  She gave him a GAF score of 75, the same as Dr. Nowlin did in June 2003. (*Id.*)  Follow up notes by Dr. Jacinto reflect that Plaintiff was frustrated because she did not see any progress in treatment of H.S.'s ADHD, and she wondered if the medications were causing neurological side effects like headaches and tics. (*Id.* at 355.)[5]  By October 2003,

---

[5]  As noted above, the medication also affected H.S.'s appetite and Plaintiff would eventually be forced to take H.S. off of any medication for his ADHD because she could no longer afford it. (*See id.* at 386.)

Dr. Jacinto dropped H.S.'s GAF score to 70, indicating mild symptoms.  (*Id.* at 358.)

In follow up exams, Dr. Jacinto lowered her GAF score to 60, reflecting that H.S. had

moderate symptoms or moderate difficulty in social, occupational, or school functioning.

(*See, e.g., id.* at 356, 357.)

In February 2004, H.S. saw Robert Henley, Ph.D., for a psychological evaluation

as part of the state disability determination process.  (*Id.* at 275.)  Dr. Henley reported

that H.S. sat quietly and unsupervised in the reception area while Plaintiff was

interviewed, he "exhibited a friendly, social demeanor with occasional attention to

humor," and he exhibited "moderately high physical movement," although he "never got

out of his chair." (*Id.* at 277.)  Dr. Henley assessed H.S. to have a Full IQ of 110, which

put him in the 75th percentile.  (*Id.*)  H.S.'s subscores ranged from slightly below

average to superior.  (*Id.*)  Dr. Henley concluded, "there appears to be ample evidence

from objective sources that [H.S.] indeed exhibits academic and affective deficits.

Adaptive functioning (daily living skills) are with the broad normal range." (*Id.* at 278.)

In early 2005, school officials, including teachers, H.S.'s principal, and school

psychologist, conducted an evaluation report because of H.S.'s problems at school.  (*Id.*

at 385-91.)  H.S. had behavioral scores that fell into the clinically significant range,

indicating that H.S. had a high level of problem behavior.  (*Id.* at 388.)  However, other

scores for items like depression, locus of control, and confidence in his abilities were

within the average range.  (*Id.* at 389.)

2.    *Diabetes*

Aside from H.S.'s ADHD and ODD, Plaintiff alleges that he suffers from diabetes mellitus.  In March 2002, H.S. complained of weight loss and increased urinary frequency.  (*Id.* at 224.)  These symptoms lead doctors to diagnose him with Type I diabetes mellitus.  (*Id.* at 222.)

H.S. saw Dr. Hasan at the Phoenix Children's Hospital for treatment of his diabetes.  In December 2002, Dr. Hasan noted that H.S. and Plaintiff did a "good job of checking blood sugars, alternating injection sites and following a meal plan."  (*Id.* at 207.)  Dr. Hasan also pointed out that H.S. was "well nourished" and "well-developed." (*Id.*)  Dr. Hasan's notes contrast somewhat with Plaintiff's various concerns that H.S. was losing too much weight as a result of his diabetes and the side effects from his ADHD medication.  (*Id.* at 213, 222.)

Additional treatment records from Dr. Hasan indicate that H.S. could generally control his diabetes, but that the situation was not ideal.  For example, one note in the record reflects that H.S. would sneak several candy bars per day (*id.* at 292), and other notes reflect that H.S. had variable blood sugars and troubles with rotation of the injection site.  (*Id.* at 317, 324.)

C.    <u>State Medical Experts</u>

The Commissioner obtained two consultative reports from state-agency medical professionals.  Both reports concluded that H.S. did not suffer from a disability.  (*Id.* at 178-83, 249-54.)

The first consultative report came in July and September 2002.  Drs. Kirschunk and Bettis concluded that H.S. suffered from a severe impairment (or impairments), but that H.S.'s impairments did not meet, or medically or functionally equal an impairment in the listings.[6]  (*Id.* at 178.)  In each functional domain, the consultative experts found that H.S. suffered from either a less than marked limitation or no limitation at all.  (*Id.* at 180-81.)  In support of their conclusion, they cite to H.S.'s "good intelligence" and "[g]ood academics when he can stay on task."  (*Id.*)  They also point out that H.S. saw "much improvement" in his ADHD symptoms with medication.  (*Id.*)

These findings were largely repeated in February 2003 by two additional state consultative professionals, Drs. Kirschner and Mahoney.  (*Id.* at 249-54.)  Like the state doctors before them, Drs. Kirschner and Mahoney found that H.S. had less than marked limitations in his functional domains as a result of his ADHD and diabetes.  (*Id.*)  The doctors did not find any marked or extreme limitations, and they noted that H.S.'s ADHD and ODD were "much improved from [the] beginning of [his] treatment."  (*Id.* at 251.)

D.   Plaintiff's Own Reports

Plaintiff also filled out a "Function Report" for H.S. on June 7, 2002.  (*Id.* at 112.)  Plaintiff checked boxes indicating that H.S. could not always explain why he did something (*id.* at 115), could not understand money (*id.* at 116), could not play team

---

[6]   The "listings" refer to the impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1.  *See* 20 C.F.R. § 416.926(a).

9

sports (*id.* at 118), did not do what he is told most of the time, did not obey safety rules,

did not get to school on time, only occasionally accepted criticism (*id.* at 119), did not

finish tasks he had started, did not complete his homework, and did not complete his

chores most of the time.  (*Id.* at 120.)  Plaintiff filled out another "Function Report" for

H.S. in December 2002 indicating that H.S.'s physical abilities were limited because of

his diabetes.  (*Id.* at 127.)  The December Report also reflected that H.S. got "frustrated

easily" and got into verbal and physical fights with his friends.  (*Id.* at 128.)  Plaintiff

stated that H.S. did not do household chores or homework and that, "It is a complete

fiasco to try to get him to do chores or just to pick up anything."  (*Id.* at 129.)

## II.    PROCEDURAL HISTORY

The procedural history in this case is somewhat unique and critical to Plaintiff's

arguments on appeal.  Plaintiff filed her application for benefits on behalf of H.S. on May

28, 2002.  (*Id.* at 65-69.)  The Commissioner denied the application and Plaintiff

requested a hearing before the ALJ.  The ALJ held a hearing on November 20, 2003,

at which Plaintiff, H.S. and a state medical expert, Dr. Jasinsky, testified.  (*Id.* at 464.)

However, upon discovering that the record lacked nearly one year's worth of medical

records, the ALJ continued the hearing to obtain the additional evidence.  The ALJ re-

scheduled the hearing for May 2004.  However, the May 2004 hearing never took place

because there was apparently still an issue with the medical evidence.  Without ever

holding a second hearing, the ALJ issued her written decision on June 23, 2005.

(*Id.* at 15.)  Plaintiff requested review of the ALJ's decision by the Appeals Council,

which was denied in September 15, 2005.  (*Id.* at 7.)  Plaintiff repeatedly requested

reconsideration of the Appeals Council's decision, but the Appeals Council denied those

requests, as well, on June 25, 2008.[7]  (*Id.*)  Plaintiff then filed an appeal of the

Commissioner's decision in this Court on July 25, 2008.[8]

>        A.        The ALJ Hearing

As noted above, the ALJ held one hearing in this matter on November 20, 2003.  (*Id.* at

464-81.)  The ALJ opened the hearing by noting that Plaintiff did not have counsel,

stating the lawyers are sometimes helpful in these matters, and inquiring whether

Plaintiff wished to proceed without counsel.  (*Id.* at 467.)  Plaintiff responded that she

wished to waive her right to counsel and the ALJ then explained the sequential process

used to determine whether Plaintiff was entitled to SSI benefits.  (*Id.* at 468.)

>        The ALJ then briefly questioned H.S., who was ten years-old at the time.  (*Id.*)

H.S. testified that he was doing "[s]ort of good and sort of bad" in school.  (*Id.* at 469.)

When asked to explain what he meant, H.S. stated that he "sometimes" did his work,

but that he would also talk to the other kids sitting around him.  (*Id.* at 469.)  H.S. also

testified that some of his friends used "bad words," which made him feel bad, but he did

---

[7]  Plaintiff contends that the Appeals Council failed to address her requests to submit a brief, and did not provide her with a transcript of the hearing until over one year after it had denied her request to review the ALJ's decision.  Although the Court considers the delay inexcusable, for the reasons explained below, it need not address whether the Appeals Council's delay constituted a denial of Plaintiff's due process rights.

[8]  Plaintiff incorrectly filed several briefs for summary judgment, which were stricken by the Court.  (*See* Doc. # 16.)  However, she eventually filed a proper Opening Brief on December 9, 2008 (Doc. # 17), to which the Commissioner responded on January 8, 2009. (Doc. # 19.)  Plaintiff has not filed a reply brief.

not identify any other disruptive behavior or disciplinary problems.  (*Id.*)  H.S. stated that he was doing "good" with his diabetes and the ALJ declined to elaborate on the issue. (*Id.*)

Plaintiff testified next regarding her son's alleged impairments.  She testified about H.S.'s early problems in kindergarten and first grade, and his growing inability to sit still in class that lead to his diagnosis of ADHD in second grade.  (*Id.* at 470.)  She described an incident when H.S. was allegedly kicked by his teacher as a triggering event for her concerns over his behavior.  (*Id.* at 471.)  She also expressed her own frustration with his continued bad behavior at school, notwithstanding the fact that H.S. had started drug treatment for his ADHD.  (*Id.*)

Plaintiff described how she had moved her children from a standard, public school to a "traditional," public school with a more rigorous academic curriculum. (*Id.* at 473.)  Plaintiff stated that the school transfer was precipitated by her desire for a more challenging curriculum, and that H.S.'s grades had slipped since he transferred, despite his various ADHD medications.  (*Id.* at 472.)

Plaintiff also testified regarding her struggle to find an effective medication. (*Id.* at 473.)  She stated that H.S.'s behavior improved slightly when he took medication, like Adderall, but that the medications only worked for short periods of time and caused serious complications with his diabetes treatment.  (*Id.* at 474.)  The ALJ questioned Plaintiff on why she continued to treat H.S. with medication if she felt that the medica-tion was not totally effective.  Plaintiff responded that she wanted him to be able to

perform well in school, even if it was only for a short period of time.  (*Id.* at 475.)  The ALJ was apparently unsatisfied with this answer and continued to push Plaintiff on why she gave her son medications that were only minimally effective.  On the ALJ's further questioning, Plaintiff responded that she and H.S.'s doctors were "trying to find the right" medication for H.S, *i.e.*, one that worked without causing problems with H.S.'s diabetes. (*Id.*)

The ALJ then moved on to examine the state medical expert, Dr. Jasinsky. (*Id.* at 476.)  Dr. Jasinsky first asked Plaintiff if H.S. was still receiving treatment and still enrolled in a regular classroom, versus some type of special education.  Plaintiff replied that, yes, H.S. still received treatment and continued to attend regular classroom activities.  (*Id.* at 476-77.)  Dr. Jasinsky then recapped the medical evidence that he had reviewed in preparation for the hearing, which, as the parties would come to discover, did not include almost one year's worth of H.S.'s medical records. (*Id.* at 477-78.)

The ALJ then asked with some agitation, "And then why are we hear [sic] today, because we don't have the latest record?"  (*Id.* at 478.)  Plaintiff stated that she thought the Commissioner's office had requested up-to-date records and the ALJ responded that, "We get them to a point, but that's why attorneys are always helpful because you get your latest record."  (*Id.* at 478.)  The parties then discussed whether H.S.'s medical records, dating to December 2002, were an accurate reflection of H.S.'s true condition. Plaintiff contended that H.S. had not improved demonstrably on medication, whereas

Dr. Jasinksy opined that the records showed H.S. had improved on medication.  (*Id.* at 478-79.)

Perturbed by the missing evidence, the ALJ interrupted Dr. Jasinsky, who had started to describe H.S.'s behavioral problems, stated that she would not make a decision, and concluded that, "We've pretty well wasted our time today because we don't have appropriate records."  (*Id.* at 479.)  She directed Plaintiff to obtain and submit all of the records from Jewish Families, where H.S. had been treated by Dr. Nowlin, at which point the ALJ would reschedule the hearing.  (*Id.* at 479-80.) The ALJ then closed the hearing.

B.      The ALJ's Written Decision

It was not until almost two years later, on June 23, 2005 that the ALJ issued her written decision.  She never held the supplemental hearing that she had planned for May 2004.

In her decision, the ALJ explained the sequential process under which the Commissioner makes disability determinations in cases involving minors.  (*Id.* at 19.) At the first step, the ALJ noted that H.S. had never engaged in substantial gainful employment.  (*Id.*)  At the second step, the ALJ pointed out that H.S. had three severe impairments, "type I diabetes mellitus, attention deficit hyperactivity disorder and oppositional defiant disorder."  (*Id.*)

For the third step, discussed the various testimony and evidence in the record, including evidence submitted after the November 2003 hearing.  The ALJ noted that

14

H.S. had testified during the hearing regarding school, that he had friends in his neighborhood, and "was doing well with his diabetes mellitus." (*Id.*) She found his testimony credible. (*Id.* at 20.) She also recounted Plaintiff's testimony regarding H.S.'s difficulties in school and at home, *e.g.*, poor grades, trouble concentrating, arguing with teachers, an inability to remain in his seat, fights with his older sister, and trouble reconciling his ADHD medication with his diabetes. (*Id.*) The ALJ stated that she found Plaintiff's testimony only "partially credible." (*Id.*)

The ALJ also included a thorough review of the medical and educational evidence in the record. She recapped H.S.'s treatment with multiple ADHD drugs, his use of insulin for diabetes, and his various functioning and psychiatric tests, including multiple GAF tests and scores. (*Id.*) She noted that he had an above-average IQ score and performed certain academic functions at an elevated level (math and reading recognition), while other skills were "quite advanced." (*Id.* at 21.) However, she also noted that a psychologist had described H.S.'s classroom behavior as "maladaptive" and that his work production fell below average. (*Id.*) The ALJ also recounted Dr. Jasinsky's hearing testimony, which disclosed that H.S. had a history of treatment for ADHD dating to September 2001. (*Id.*)

Based on the record, the ALJ concluded that H.S. did "not have an impairment that meets or medically equals the requirements of any listed impairment." (*Id.*) Thus, she proceeded to analyze whether H.S.'s impairments resulted in limitations that functionally equaled the listings. She described the six domains, or areas of

functioning, that are critical to the functional equivalency determination, and described the appropriate legal standards and definitions.  (*Id.* at 21-22.)

The ALJ found that H.S. had less than marked limitations in three domains, acquiring and using information, attending and completing tasks, and interacting and relating with others.  (*Id.* at 22-23.)  She found that H.S. had no limitations in the other three domains, moving about and manipulating objects, caring for himself, and health and physical well-being.  (*Id.* at 24.)  Regarding H.S.'s ability to acquire and use information, the ALJ noted that H.S. had above-average IQ scores, achieved grades of A, B, and C in December 2002, his sixth-grade teacher described him as very intelligent and his Stanford 9 scores during 2003 to 2004 were average to above-average.  (*Id.* at 23.)  Regarding the limitation on attending and completing tasks, the ALJ found that H.S. had problems staying seated in class and turning in work on time, but that medication had improved his ability to concentrate for longer periods of time and that he attended school regularly.  (*Id.*)  Regarding the limitation on interacting and relating with others, the ALJ found that H.S. got along well with teachers and adults, but had problems with family and other students, as well as worsening discipline problems at school after October 2004, when H.S. had stopped taking medication for his ADHD. (*Id.*)

The ALJ concluded that, "The evidence shows that [H.S.] is a fairly well-adjusted, bright and energetic 12-year-old boy. * * * Based on the totality of the evidence, including the medical and school records, the undersigned finds no evidence of extreme

limitations in one, or marked limitations in two, of the domains of functioning." (*Id.* at 22.)

## STANDARD OF REVIEW

Section 405(g) of the Social Security Act establishes the scope of this Court's review of the Commissioner's denial of disability insurance benefits. *See* 42 U.S.C. § 1383(c)(3) (incorporating review provisions of 42 U.S.C. § 405g). Section 405(g) provides, in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, and where a claim has been denied by the Commissioner of Social Security or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Commissioner of Social Security, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall review only the question of con-formity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g). Thus, this Court's review is limited to determining whether the record as a whole contains substantial evidence supporting the Commissioner's decision. *See* § 405(g); *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497-98 (10th Cir. 1992). The Court must uphold the Commissioner's decision if it is supported by substantial evidence. See *Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987). This Court cannot re-weigh the evidence nor substitute its judgment for that of the ALJ. *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987). That does not mean, however, that review is merely cursory. To find that the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant evidence

that a reasonable person might deem adequate to support the ultimate conclusion.

*Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987).  A decision is not based on

substantial evidence if it is overwhelmed by other evidence in the record or if there is a

mere scintilla of evidence supporting it.  *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir.

1985).  The ALJ's decision is also subject to reversal for application of the wrong legal

standard.  *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

## ANALYSIS

Under the standard of review described above and the applicable law described

below, the Court finds that the Commissioner failed to give Plaintiff the due process

required by law.

## I.    APPLICABLE LAW – DISABILITY DETERMINATIONS FOR MINORS

An applicant for SSI benefits under eighteen years-old will be considered

disabled if he has a "medically determinable physical or mental impairment, which

results in marked or severe functional limitations, and which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less

than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  The applicant must demonstrate the

existence of the impairment using "medically acceptable clinical and laboratory

diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(D).

The Social Security Regulations require the Commissioner to apply a sequential

evaluation process to determine whether a minor applicant meets the disability criteria.

Initially, the Commissioner should determine whether the applicant is working.

20 C.F.R. § 416.924(b).  If the applicant is working and the work being performed is substantial gainful activity, the applicant is not disabled.  20 C.F.R. § 416.924(b).  If the applicant is not gainfully employed, the Commissioner must determine whether the applicant has a severe medically determinable impairment.  20 C.F.R. § 416.924(c).  The impairment or combination of impairments must cause the applicant more that minimal functional limitations.  20 C.F.R. § 416.924(c).  If the Commissioner finds no impairment, the applicant is not disabled.  However, if the Commissioner identifies a severe impairment (or impairments), he then must determine whether the impairments "meet, medically equal, or functionally equal the listings."  20 C.F.R. § 416.924(d).

Regarding the third step in the process, the Commissioner can find that an impairment is medically equivalent to a listed impairment if the applicant's impairment is of at least equal medical significance to a listed impairment, *i.e.*, equal in severity and duration to a listed impairment.  20 C.F.R. § 416.926(a).  If the applicant cannot show a listed impairment or medical equivalence, the Commissioner must determine whether the impairment results in limitations that functionally equal a listed impairment.  *See* 20 C.F.R. § 416.926a(a).  The Social Security Regulations describe functional equivalence as follows:  "By 'functionally equal the listings,' we mean that your impairment(s) must be of listing-level severity; *i.e.*, it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain, as explained in this section."  20 C.F.R. § 416.926a(a).  There are six "domains," broad areas of functioning intended to cover what a minor can or cannot do, in the section.  The domains are:

     (i)      Acquiring and using information;

     (ii)     Attending and completing tasks;

     (iii)    Interacting and relating with others;

     (iv)    Moving about and manipulating objects;

     (v)     Caring for yourself; and

     (vi)    Health and physical well-being.

*See* 20 C.F.R. § 416.926a(b)(1)(i)-(vi).

To prove functional equivalence, a minor applicant must show that his impairment causes "marked" limitations in at least two domains, or an "extreme" limitation in at least one domain. 20 C.F.R. § 416.926a(a). The Social Security Regulations define a marked limitation as one that "interferes seriously with [a claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). A marked limitation is "more than moderate" but "less than extreme" and is tantamount to results on a standardized test that are at least two, but less than three, standard deviations below the mean. 20 C.F.R. § 416.926a(e)(2)(i). The Social Security Regulations define an extreme limitation as one that "interferes very seriously with [a claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation does not mean a total inability to function, but is tantamount to results on a standardized test that are at least three standard deviations below the mean. 20 C.F.R. § 416.926a(e)(2)(I).

## II.    DUE PROCESS

Plaintiff raises two due process arguments that she contends warrant remand. First, she argues that the ALJ erred by declining to hold a second hearing to address additional evidence that had been adduced after the original November 2003 hearing. Second, she argues that the Appeals Council erred by denying Plaintiff's request to reconsider without allowing Plaintiff to submit a brief, failing to timely respond to counsel's numerous requests to reconsider, and refusing to address Plaintiff's brief. In response to Plaintiff's due process argument, the Commissioner admits that "there may have been procedural irregularities," but he argues that any errors were harmless. (Doc. # 19 at 18.)  However, the Court disagrees and concludes that the ALJ's failure to hold a second hearing was not harmless under the facts of this case.

A.    Applicable Law – The Hearing Process

A applicant whose application for SSI benefits has been denied by the Commissioner is entitled to notice of the denial and the opportunity to have a hearing regarding the Commissioner's decision.  42 U.S.C. § 405(b)(1); *Allison v. Heckler*, 711 F.2d 145, 147 (10th Cir. 1983).  If a hearing is held, the Commissioner "shall, *on the basis of evidence adduced at the hearing*, affirm, modify, or reverse" the earlier decision.  42 U.S.C. § 405(b)(1) (emphasis added).

The notice and hearing must conform to due process requirements.  *See Yount v. Barnhart*, 416 F.3d 1233, 1235 (10th Cir. 2005); 16D C.J.S. *Constitutional Law* § 1997 (2009).  Thus, "Although a hearing is informal in nature, due process requires

21

that any hearing afforded a claimant be full and fair."   16D C.J.S. *Constitutional Law*

§ 1997.  Due process prohibits an ALJ from making a disability determination on

medical evidence submitted after the hearing that the applicant has not had a

"meaningful opportunity to address."  *Yount*, 416 F.3d at 1236.

B.     The ALJ Erred By Failing To Hold A Second Hearing To Discuss Newly
       Submitted Evidence

As noted above, the ALJ cut short the November 2003 hearing because she felt

that the record was inadequate to make a disability determination.  (Admin. at 479-80.)

The ALJ indicated that she would schedule a second hearing after Plaintiff had

submitted the missing medical records.  (*Id.*)  Although Plaintiff did submit volumes

of additional medical and non-medical evidence per the ALJ's instructions, the ALJ

never held a second hearing.  Plaintiff contends this was an error, and, under the

circumstances of this case, this Court agrees.

The Court views this case as roughly analogous to *Allison*, wherein the Tenth

Circuit Court of Appeals remanded the Commissioner's denial of benefits under very

similar circumstances.  In *Allison*, the ALJ held a hearing on the plaintiff's application for

disability benefits.  711 F.2d at 146.  Instead of issuing a ruling, the ALJ took the matter

under advisement and sent the hearing record to Dr. Harvey, who was under contract

with the Department of Health and Human Services.  *Id.*  Dr. Harvey concluded that the

plaintiff was not disabled, and the ALJ adopted Dr. Harvey's report and conclusions.  *Id.*

The plaintiff objected to the ALJ's use of Dr. Harvey's post-hearing report as violative

of due process.  The plaintiff argued that she had no opportunity to cross-examine

Dr. Harvey, and no opportunity to present evidence in rebuttal to Dr. Harvey's report. *Id.* The Tenth Circuit Court of Appeals agreed with the plaintiff, stating, "An ALJ's use of a post-hearing medical report constitutes a denial of due process because the applicant is not given the opportunity to cross-examine the physician or rebut the report." *Id.* at 147.

In this case, as was the situation in *Allison*, the critical flaw with the ALJ's choice not to hold a second hearing is that the ALJ did not allow Plaintiff to meaningfully rebut any of the additional evidence submitted to the Commissioner after the November 2003 hearing. Most critically, the ALJ did not give Plaintiff the full and fair opportunity to contest Dr. Henley's psychological analysis, which was conducted in February 2004. Indeed, the ALJ explicitly discussed Dr. Henley's report in her written decision denying Plaintiff's application. In fact, the ALJ cited to Dr. Henley's intelligence aptitude testing in coming to her conclusion that H.S. had less than marked limitations in the "Acquiring and using information" domain. (Admin. at 22.) Thus, Dr. Henley's opinions formed a crucial piece of the ALJ's substantive decision.[9]

In his brief, the Commissioner points out that Plaintiff concluded her testimony at the November 2003 hearing, and indicated that she had nothing else to add. The

---

[9] The ALJ also relied on other post-hearing evidence, *e.g.*, a teacher's report from May 2004 and Stanford 9 scores from 2003 and 2004, without allowing Plaintiff to respond to or explain that evidence. While use of this additional non-medical evidence is not entirely akin to the facts in *Allison*, the ALJ's use of this additional post-hearing evidence violates the Act's mandate that the ALJ's decision "shall" be based on "evidence adduced at the hearing." 42 U.S.C. § 405(b)(1). Because the ALJ adduced this evidence *after* the hearing and based her decision on such evidence, the ALJ violated the statute.

23

Commissioner contends that Plaintiff had her hearing, and was given the opportunity to respond to "all of the evidence upon which the ALJ relied." (Doc. # 19 at 20.) However, the Court finds this argument rather dubious under the circumstances of this case because of the ALJ's promise to hold a second hearing.

Plaintiff could not testify orally at the first hearing regarding Dr. Henley's report because the report had not yet been written, and, at the time she received notice of Dr. Henley's report, Plaintiff was under the impression that the ALJ would hold a second hearing. In other words, Plaintiff had no way of knowing that her only opportunity to respond to Dr. Henley would be in writing and there was no reason for Plaintiff to spend the time and money to respond to Dr. Henley in writing when she was under the impression that a second hearing would afford her the opportunity to respond. Thus, notwithstanding the fact that Plaintiff had notice of Dr. Henley's examination, Plaintiff did not have the full and fair opportunity to question, explain, or refute Dr. Henley's crucial results because that second hearing never happened. Under the circumstances of this case, that amounts to a denial of Plaintiff's due process rights.[10]

In short, the ALJ promised to hold a second hearing, which induced Plaintiff into believing that she had an opportunity to respond orally to post-hearing evidence. The ALJ inexplicably canceled the second hearing, but still relied on post-hearing evidence,

---

[10]   At the hearing, counsel for the Commissioner argued that, were the Court to adopt Plaintiff's argument and remand the case, the remand would be not based on a denial of due process, but on a theory of detrimental reliance. However, the Court concludes that under the facts of this case the label applied to Plaintiff's argument is immaterial to the Court's decision. In any event, detrimental reliance and due process are not mutually exclusive and, in fact, likely overlap.

especially Dr. Henley's opinions, to deny Plaintiff's application.  This course of events

amounts to a denial of Plaintiff's due process and warrants remand in this case.[11]  The

Court will now briefly address what type of remand is appropriate.

C.    Remand Under Sentence Four Of 42 U.S.C. § 405(g) Is Appropriate

Plaintiff argues that the Court should remand under sentence six of § 405(g).  That

sentence states:

> The court may, on motion of the Commissioner of Social Security
> made for good cause shown before the Commissioner files the Com-
> missioner's answer, remand the case to the Commissioner of Social
> Security for further action by the Commissioner of Social Security, and
> it may at any time order additional evidence to be taken before the
> Commissioner of Social Security, but only upon a showing that there is
> new evidence which is material and that there is good cause for the failure
> to incorporate such evidence into the record in a prior proceeding; and the
> Commissioner of Social Security shall, after the case is remanded, and
> after hearing such additional evidence if so ordered, modify or affirm the
> Commissioner's findings of fact or the Commissioner's decision, or both,
> and shall file with the court any such additional and modified findings of
> fact and decision, and, in any case in which the Commissioner has not
> made a decision fully favorable to the individual, a transcript of the
> additional record and testimony upon which the Commissioner's action in
> modifying or affirming was based. Such additional or modified findings of
> fact and decision shall be reviewable only to the extent provided for review
> of the original findings of fact and decision.

---

[11]    Sufficed to say that the Appeals Council's lackadaisical treatment of Plaintiff and
her counsel raises concerns for this Court.  However, the Court, having decided that remand
is appropriate because of the ALJ's failure to hold a full and fair hearing to address all of the
evidence now in the record, does not need to address Plaintiff's additional due process
arguments regarding the Appeals Council.

Likewise, the Court need not address Plaintiff's claims that the ALJ erred in failing to
secure all of the necessary evidence to make a disability determination.

42 U.S.C. § 405(g).  The Commissioner contends that remand, if it is appropriate at all, should fall under sentence four of 42 U.S.C. § 405(g).  Sentence four states:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. § 405(g).

Sentence six permits remand when an applicant has submitted new, material evidence for which good cause exists to explain the failure to submit such evidence to the Commissioner.  *See Cagel v. Califano*, 638 F.2d 219, 221 (10th Cir. 1981) ("A remand is proper when a reviewing court concludes that the Secretary's decision might reasonably have been different had that (new) evidence been before him when his decision was rendered.") (quotations omitted).

In this case, the "new evidence" submitted by Plaintiff consists of letters and a brief sent by Plaintiff to the Appeals Council.  The letters and brief do not contain any new or substantively different information regarding H.S.'s alleged disability.  Thus, the materials submitted by Plaintiff are not material because they would not have reasonably altered the ALJ's substantive decision on H.S.'s disability.

As such, the Court agrees with the Commissioner that remand under sentence four, rather than sentence six, is appropriate.

## III.   SUBSTANTIVE ARGUMENTS

Plaintiff also raises a number of purported errors with the ALJ's substantive finding of non-disability.  However, because the Court remands this matter for a second

26

ALJ hearing to address all of the evidence now in the record, it need not address Plaintiff's substantive claims.

## CONCLUSION

By failing to hold a second hearing after indicating that she would hold such a hearing, and then basing her decision on evidence adduced after the first hearing, the ALJ precluded Plaintiff from meaningfully addressing the evidence in the record.  Thus, the ALJ failed to give Plaintiff the procedural due process required by the Act and the Social Security Regulations.  This failure requires remand under sentence four of 42 U.S.C. § 405(g) for a new hearing, during which Plaintiff will be allowed to address all of the evidence currently in the record.  Given that this matter has been pending for over seven years and given the inexplicable delay by the Appeals Council, the Court strongly urges the Commissioner to expedite the scheduling of a hearing and to issue a decision on Plaintiff's claim in as timely a manner as possible.

Accordingly, the Commissioner's decision is REVERSED AND REMANDED for additional proceedings consistent with this Order.

DATED:  July __16__, 2009

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge